**G. B. HOWELL d/b/a Howell Breeding & Training Farm, Plaintiff-Appellee-Cross Appellant,**

v.

**AMERICAN LIVE STOCK INSURANCE COMPANY, Defendant-Appellant-Cross Appellee.**

No. 73-1770.

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Sept. 6. 1973.

---

* Rule 18, 5 Cir., Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

Stephen B. Tatem, Jr., Schuyler B. Marshall El Paso, Tex., for defendant-appellant-cross appellee.

William J. Derrick, Chris A. Paul, El Paso, Tex., for plaintiff-appellee-cross appellant.

Before WISDOM, AINSWORTH and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiff-appellee, G. B. Howell, sued American Livestock Insurance Company on a livestock insurance contract to recover for the death of Riches I Seek—a two year old thoroughbred horse. The trial concerned the "actual cash value" of the colt as of its death. The jury returned a verdict for the plaintiff for $25,000, the maximum amount payable under the policy. On appeal the insurance company attacks the judgment on the ground that the trial judge abused his discretion in refusing to permit the company to introduce certain evidence aimed at proving bias on the part of one of the witnesses who corroborated the plaintiff's estimate of the horse's value. The plaintiff cross appeals on grounds that his recovery should have included a statutory penalty and a reasonable attorney's fee. We affirm on both of these issues.

Riches I Seek died of a kidney infection on November 27, 1971. Howell, d/b/a Howell Breeding and Training Farms, had purchased the horse, then a yearling, a year earlier for $6,000 with the intention of training him to be a race horse. Howell felt that the pedigree of Riches I Seek was "not the greatest", but he was familiar with the colt sire and had bred ten mares to him. Howell was impressed with the colt's

conformation, and he thought that Riches I Seek resembled the sire. Shortly after the purchase, however, the horse sustained an injury to his foot which never properly healed. As a result of the injury, Howell eventually decided that the horse could never race, but could be used only for stud.

Howell and the insurance company stipulated at trial that the death of the horse was a risk insured against loss under the policy between them. The testimony at the trial centered on determining the value of the horse. Howell sought to prove that at the time of the injury the horse was worth more than $25,000, the limit the Schedule in the policy allowed as recovery for Riches I Seek. The insurance company sought to prove that the horse was worth no more than $3,500. Three of the plaintiff's witnesses ventured estimates of the value of the horse. The plaintiff testified that he would not have considered selling Riches I Seek for less than $100,000; that the colt possessed unlimited potential for breeding with quarter mares. Charles W. Cascio had been the plaintiff's trainer during 1970 and 1971 and, according to his testimony, had been on a list of the top ten trainers for ten of the preceding twelve years. Cascio had accompanied Howell at the time the horse was purchased, and Howell had consulted him with regard to the amount of insurance to be carried. Cascio testified that he had never seen a colt that equaled Riches I Seek in appearance and conformation. He felt that he could have found a buyer of Riches I Seek for $25,000; that the horse was worth this much because of its value as a stallion. The third witness was S. E. Heatley, a neighbor of the plaintiff, who was also engaged in raising horses. Heatley testified that he estimated the horse's value at the time of its death at between $20,000 and $30,000.

The defendant produced only one witness who estimated the value of the horse. This was Mrs. Sandra Dunn Clark, a woman from Kentucky who serves as the Director of Research for the Cromwell Blood Stock Agency. She testified that her duties in that capacity involved primarily keeping statistics and preparing pedigree analyses on literally thousands of horses for use by the Agency's international clientele. This witness testified that she had conducted a pedigree analysis of Riches I Seek, which included a detailed survey of the racing records of all of the foals sired by Riches and Honor and the foals out of Eye Sultry. Riches and Honor, the sire, had entered only one official race; he won it, but the race was at a minor racetrack in Ireland. Eye Sultry, the dam, had entered seven races, but had never finished in the money. Based on Mrs. Clark's analysis, she estimated that Riches I Seek, an unproven horse with undistinguished ancestors, was worth no more than $3,500.

No doubt to the surprise of the Jockey Club and the American Quarter Horse Association, the jury returned a verdict for the plaintiff for $25,000. The plaintiff then filed a claim asserting that he was entitled to an additional 12 percent of the recovery and a reasonable attorneys fee under article 3.62 of the Texas Insurance Code[1] V.A.T.S. The trial judge overruled the plaintiff's claim, holding that New Mexico law applied to the case. This appeal and the cross appeal followed.

## I.

The defendant's appeal rests entirely on the refusal of the trial judge to allow the insurance company to introduce evidence which the company believed would demonstrate bias on the part of Charles Cascio, the horse's former trainer. The defendant sought to introduce evidence concerning the settlement of a suit between Cascio and the plaintiff. The defendant's counsel first mentioned the suit in the jury's presence, during his cross-examination of Cascio. He had

---

1. This provision is quoted in full at note 2.

opened a line of questioning by asking Cascio whether Howell had instituted a suit against him, and whether the suit had been for an accounting of funds. Cascio had answered yes to both questions. The trial judge at that point intervened, on his own motion, to prevent the defendant's counsel from pursuing the line of questioning any further.

The defendant filed a bill of exceptions to the judge's ruling, and a hearing on that bill was held out of the presence of the jury. Both Howell and Cascio testified about the suit between them. Their testimony established that Howell had instituted suit against Cascio on August 15, 1971, some seven months before the filing of the complaint in this suit, and some fifteen months before the trial. His claim had been for about $35,000. Cascio apparently filed a counterclaim in the suit, although neither he nor Howell described the specific nature of the counterclaim. Cascio testified that he had given a deposition in the suit in November 1971 and that Howell's deposition in that suit was never taken. Both Cascio and Howell testified that they had discussed the suit together informally on occasions scattered throughout the spring and summer months of 1972, that their lawyers had not participated in those discussions, and that it was during those discussions that they came to an understanding about dismissing their claims against each other. Howell testified that to the best of his recollection they had reached agreement by August 1972. Howell testified that the suit had not been dismissed by the time of his testimony, on October 26, 1972, because the lawyers for the two men had been negligent in dismissing the suit; he attributed the negligence in particular to the involvement of one of Cascio's attorneys in some form of political activities, the specific nature of which he did not describe. Cascio testified that Howell had notified him in late September or early October that he, Howell, had instructed his lawyers to dismiss the suit. In any event, the suit was finally dismissed at

9:31 a. m. on October 27, 1972, the final day of the trial in this case.

Both Cascio and Howell emphatically denied that they had ever discussed Riches I Seek or the suit against the insurance company during the discussions of the settlement. Cascio testified that Howell had first asked him to testify in this suit about two weeks before the trial, and that Howell had said that if Cascio refused to testify voluntarily he would be subpoenaed. Cascio said he had agreed to testify because he thought the position of the insurance company "wrong".

■ The trial judge refused to permit any of this testimony to be introduced before the jury. We conclude that his refusal did not constitute an abuse of judicial discretion.

■ The extent to which a witness may be cross-examined for the purposes of showing bias rests on the sound discretion of the trial judge. See, e. g., Alford v. United States, 1930, 282 U.S. 687, 696, 51 S.Ct. 218, 75 L.Ed. 624. The task of the trial judge is to balance the probative value of the evidence sought to be introduced against the risks its admission may entail. The potential risks may include the possibility of undue prejudice, embarrassment, or harassment, either to the witness or to a party; the possibility of misleading or confusing the jury; or the possibility of undue delay or waste of time. See, e. g., United States v. 412.93 Acres of Land, 3 Cir. 1972, 455 F.2d 1242, 1247; Rule 403, Proposed Federal Rules of Evidence (1972).

In the present case we are unable to say that it was not within the discretion of the trial judge, when he invoked these considerations, to conclude that the risks involved in admitting the evidence outweighed any possible benefits admitting it might have had. When we look at one side of the balance, we find that there were grounds on which the judge might well have decided that the evidence would have had little probative value. In the first place, the tendency of the

evidence to prove that there was any connection between the settlement of the suit and Cascio's appearance as the plaintiff's witness here was, to say the least, slight. Perhaps more important, there were at least two grounds on which the judge might reasonably have concluded that the proffered testimony was wholly unnecessary. First, there was other evidence in the record which went to the general issue of Cascio's reliability: the jury heard that Cascio and Howell had been acquainted since childhood, for fifteen or twenty years; that Howell had employed Cascio as a trainer; and, most important, that there had been a suit between them for an accounting. Second, the material part of Cascio's testimony—his estimate of the value of the horse—was corroborated by two other witnesses. His testimony was by no means so critical that the trial judge should have been alert to let the jury hear every piece of evidence, however fragile, which might have influenced the jury's estimate of his credibility.

When we look at the other side of the balance, we find grounds on which the trial judge might have concluded that introducing this evidence entailed any of three of the risks we mentioned above. In introducing the evidence, the defendant would have been implying that Cascio and Howell were guilty of conspiring to deceive the court; certainly the trial judge might have found this involved the possibility of undue prejudice, harassment, or embarrassment, either to Cascio or to the plaintiff. Considerations of time and judicial economy might also have entered the trial judge's calculation. It is unlikely that the contest over the issue of Cascio's credibility could have stopped with the limited testimony which the judge had heard on the bill of exceptions. Howell undoubtedly would have wished to produce evidence to rebut the defendant's charge, and he would have been entitled to do so. The possibility that the trial would become involved in a lengthy wrangle over a side issue was not absent. Finally, reviewing Cascio's and Howell's testimony on the bill, and noting the little it contains establishing any real connection between the settlement and Cascio's appearance, we can understand how the trial judge could have concluded that admitting the evidence would run the risk of misleading or confusing the jury.

In sum, then, while we are not prepared to say that we find the proffered evidence wholly irrelevant, or even that it clearly appears that it should have been excluded, at the same time we are unable to say that the district judge roamed beyond the bounds of his discretion in ruling as he did. In consequence, we cannot disturb the judgment rendered at trial.

II.

The appellee's cross appeal is predicated upon article 3.62 of the Texas Insurance Code. This article provides that whenever an insurance company fails to pay any policyholder any amount due under a life, health, or accident insurance policy within thirty days of demand, the insurance company is liable for damages of 12 percent of the amount due, as well as for a reasonable attorneys fee sustained in the collection of the amount.[2]

---

2. V.A.T.S. Insurance Code, art. 3.62 (1951) provides in full:

In all cases where a loss occurs and the life insurance company, or accident insurance company, or life and accident, health and accident, or life, health and accident insurance company liable therefor shall fail to pay the same within thirty days after demand therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of loss, twelve (12%) percent damages on the amount of such loss together with reasonable attorney fees for the prosecution and collection of such loss. Such attorney fee shall be taxed as part of the cost of the case. The Court in fixing such fee shall take into consideration all benefits to the insured incident to the prosecution of the suit, accrued and to accrue on account of such policy.

The cross appellee raises the question whether this statute applies to a livestock insurance contract such as the one involved

The plaintiff makes a delicate argument for the applicability of this provision to the facts of this case. He notes that Klaxon v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477, requires that we apply Texas choice of law rules to determine what law is applicable. He then points to another provision of the Texas Insurance Code, article 21.42, as constituting the Texas choice of law rule requiring application of Texas law. Article 21.42 provides by its terms that any contract of insurance between a Texas resident and any insurance company which is doing business in Texas is to be governed by Texas law.[3] The plaintiff, Howell, is a citizen of Texas, although his farm, the Howell Breeding and Training Farm, is located in New Mexico. The defendant did business in Texas as well as New Mexico. Thus, if we pay attention only to the express terms of article 21.42, the plaintiff appears to present us with an airtight case for his recovery of the penalty and attorneys fees.

The Supreme Court of Texas, however, has taken the view that article 21.42 is not to be applied in cases such as the one before us. Austin Building Co. v. National Union Fire Ins. Co., Tex.1968, 432 S.W.2d 697, held that the statute was not to be given extraterritorial effect. In that case the Court said that such statutes as article 21.42 cannot

" . . . be given extraterritorial effect so as to apply to a policy or bond written or executed by a foreign insurer in another state, even though the insured was a citizen or resident of the state which had adopted the statute in question, and even though the foreign insurer also did other business within that state."

432 S.W.2d at 701, quoting 2 Couch on Insurance § 16:20 at 31 (1959). The Texas Court read article 21.42 as designed only to assure that Texas law will apply to contracts made between Texas citizens and insurance companies doing business in Texas, *when and only when* those contracts are made in the course of the company's Texas business. Otherwise, the law to be applied was to be the law the parties intended to apply, which, in the absence of any contrary indication, was presumed to be the law of the state where the contract was made.[4]

---

here. We need not venture any answer to that question in view of our holding on the choice of law question.

3. V.A.T.S. Insurance Code, art. 21.42 (1951) provides in full:

Any contract of insurance payable to any citizen or inhabitant of this State by any insurance or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

The rationale for this assertion of lawmaking authority by Texas is given in the following section of the Insurance Code:

The provisions of this Code are conditions upon which a foreign insurance corporation shall be permitted to do business within this state, and any such foreign corporation engaged in issuing contracts or policies within this state shall be held to have assented thereto as a condition precedent to its right to engage in such business within this state.

V.A.T.S. Insurance Code, art. 21.43 (1951).

4. The plaintiff cites three cases, one decided by this Court and the others by federal district courts sitting in Texas. He contends that these claims warrant the application of Article 21.42. Schroder v. John Hancock Mut. Life Ins. Co., 5 Cir. 1965, 349 F.2d 406; Zorn v. Aetna Life Ins. Co., E.D.Tex. 1965, 260 F.Supp. 730, aff'd, 5 Cir. 1965, 368 F.2d 1013; Wilburn Boat Co. v. Fireman's Fund Ins. Co., E.D.Tex.1960, 199 F. Supp. 784, rev'd on other grounds, 5 Cir. 1962, 300 F.2d 631, cert. denied, 1962, 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505. These cases are distinguishable. In each of these cases invoking article 21.42, the court applied Texas law to a contract actually "made"—in one sense or another of that word—out of state.

*Wilburn Boat Co.* was a case where the application of Texas law was consistent with the approach of *Austin Building Co. Wilburn Boat Co.* was a suit to recover for

the destruction by fire of a boat. The original insurance contract had been made between a California insurance company and two beneficiaries, one an Iowa resident and the other an Illinois resident. That contract had been transferred to two Texas residents who had purchased the boat, at the time of the purchase. The boat had been kept on a lake in Texas after its purchase, and the accident involved had occurred in Texas. Since the named beneficiaries were Texas residents, and since the insured boat was kept in Texas, there were grounds for concluding that the two parties who were parties to the contract after the transfer intended the contract to be governed by Texas law.

*Zorn* and *Schroder* pose substantial difficulties which call for an explanation. The facts of the two cases are identical in all respects relevant to our purposes here. Both involved suits to recover benefits under group life insurance policies. In both cases, the major contract establishing the group policy had been made between a foreign insurance company and an employer resident in a state outside of Texas. The insurer was doing business in Texas, and the plaintiffs, beneficiaries on the group contracts, were residents of Texas. In both suits, the federal courts, following the interpretation of article 21.42 first made in Metropolitan Life Ins. Co. v. Wann, 1937, 130 Tex. 400, 109 S.W.2d 470, held that Texas law applied.

The difficulty *Wann*, *Zorn*, and *Schroder* present is that they seem to assume a theory of article 21.42 that is basically contradictory to the theory implicit in the *Austin Building Co.* case, which we regard as controlling. *Austin Building Co.* interprets article 21.42 to mean that Texas law applies only when the insurance company has made the contract in question within the same course of "business done in Texas" which satisfies the statutory condition of its "doing business in Texas". *Wann* and its progeny, on the other hand, permit a kind of "bootstrapping", whereby the fact that the insurer does *any* business in Texas is sufficient to require that Texas law apply to any contract between it and a Texas resident, regardless of the intention or expectation of the parties. This "bootstrapping" logic is, of course, consistent with the literal language of the statute. This tension between *Wann* and *Austin Building Co.* does not appear ever to have been confronted by the Texas courts. The Texas Supreme Court decided *Austin Building Co.* in 1968, after the *Wann* rule had existed for over thirty years, without mentioning *Wann*.

The *Wann* rule represents an exceptional rule designed only for the special case of group insurance contracts. The efforts of the Texas courts to apply article 21.42 to group insurance contracts have a very peculiar history, and the *Wann* rule can be understood only in light of that history. Prior to 1937, the Texas courts consistently held that when the group insurer issued and delivered the group policy to a Texas beneficiary, the insurer by the acts of issuance and delivery was "doing business" in Texas for the purposes of article 21.42. See, e. g., Metropolitan Life Ins. Co. v. Worton, Tex. Civ.App.1934, 70 S.W.2d 216; see *Wann*, 109 S.W.2d at 472. In 1937, however, in what Judge Friendly, writing for this Court in *Schroder*, called "one of the last gasps of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L. Ed. 865 (1842)", the Supreme Court in a diversity suit refused to follow this interpretation of article 21.42. Boseman v. Connecticut Gen. Life Ins. Co., 1937, 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036. Thereafter, the Texas Supreme Court, in "deference" to the views of the United States Supreme Court, abandoned the pre-1937 interpretation of the term "doing business". But at the same time it adopted the *Wann* rule as a substitute theory for subjecting the claims of Texas beneficiaries of group policies to Texas law. See *Wann*, 109 S. W.2d at 472. The *Wann* rule has remained the law of Texas since 1937.

One important thing to note about this history is that the pre-1937 rule, unlike the rule adopted in *Wann*, does not in any way imply a theory of article 21.42 that is at odds with the general theory implicit in the *Austin Building Co.* case. If one accepts the proposition that the issuance and delivery of the group policy constituted "doing business", then the contract in a suit like *Wann* or *Schroder* will have been made in the same course of business which satisfies the statutory condition of "doing business in Texas". The theoretical tension between *Wann* and *Austin Building Co.* thus emerges as little more than a vestige of the *Swift* era, and poses no real threat to the general theory of article 21.42 and provisions like it which we adopt here. That tension could be cured entirely if the Texas courts returned to the pre-1937 rule; and this Court has already once, in *Schroder*, noted "the possibility that Texas might determine to shrug off the shackles assumed in *Wann* in deference to the Supreme Court's *Boseman* decision", 349 F.2d at 408, in the wake of Erie R. R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

In sum, the *Wann* rule, even as it now stands, does not affect the result in this case. *Wann* and *Austin Building Co.* continue to coexist, however uneasily, and *Austin Building Co.* governs cases outside the context of group insurance policies.

In *Austin Building Co.*, a contract made and executed in Kansas covered property situated in Kansas. The Texas Court held that Kansas law should be applied. Here, the contract was made and executed in New Mexico. Riches I Seek was kept on Howell's farm in New Mexico from the time he was first transported there immediately after Howell had purchased him in 1970. It is fair to assume, in the circumstances this case presents that the parties intended New Mexico law to apply. Under the principle of the *Austin Building Co.* case, the district judge was correct in applying New Mexico law.

The judgment is affirmed.