

# THE ATTORNEY GENERAL
## OF TEXAS

August 2, 1988

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Chet Brooks
Chairman
Committee on Health and
    Human Services
Texas State Senate
P. O. Box 12068
Austin, Texas 78711-2068

Opinion No. JM-937

Re: Insurance coverage for
in vitro fertilization
(RQ-1334)

Dear Senator Brooks:

You ask our opinion on a number of questions concerning a requirement imposed by the legislature that certain group health insurance policies provide coverage for in vitro fertilization procedures,[1] or reproduction through fertilization of an ovum by a sperm outside of the body. Annas and Elias, <u>In Vitro Fertilization and Embryo Transfer: Medicolegal Aspects of a New Technique to Create a Family</u>, 17 Family L.J. 199 at n. 1 (1983). After describing the legislation, we will answer each of your questions in turn.

The 70th Legislature amended the Insurance Code to mandate health insurance coverage for in vitro fertilization procedures in certain circumstances. Acts 1987, 70th Leg., ch. 526, at 2135. The legislation was effective on September 1, 1987, and applies to all policies and other evidence of coverage delivered, issued for delivery, or renewed after January 1, 1988. <u>Id.</u> The text of the statute follows.

[In vitro fertilization procedure]

    Sec. 3A. (a) All insurers, nonprofit hospital and medical service plan corporations subject to Chapter 20 of this code,

---

1. The statute also applies to entities such as health maintenance organizations and employer self-insurance plans. <u>See generally</u> Chapter 20 of the Insurance Code. Our discussion of the law applies to all such entities.

health maintenance organizations subject to the Texas Health Maintenance Organization Act (Chapter 20A, Vernon's Texas Insurance Code), and all employer, multiple-employer, union, association, trustee, or other self-funded or self-insured welfare or benefit plans, programs, or arrangements that either issue group health insurance policies, enter into health care service contracts or plans, or provide for group health benefits, coverage, or services in this state for hospital, medical or surgical expenses incurred as a result of accident or sickness shall offer and make available to each group policyholder, contract holder, employer, multiple-employer, union, association, or trustee under a group policy, contract, plan, program, or arrangement that provides hospital, surgical, and medical benefits, coverage for services and benefits on an expense incurred, service, or prepaid basis for out-patient expenses that may arise from in vitro fertilization procedures, if the group insurance policy, contract, plan, program, or arrangement otherwise provides pregnancy-related benefits for the insureds, enrollees, subscribers, employees, members, or other persons covered under the policy contract, plan, program, or arrangement.

(b) An offer made under Subsection (a) of this section is subject to this section.

(c) A rejection of an offer to provide the coverage for services or benefits provided by Subsection (a) of this section must be in writing.

(d) Benefits for in vitro fertilization procedures must be provided to the same extent as the benefits provided for other pregnancy-related procedures under the policy, contract, plan, program, or arrangement.

(e) The offer to make the coverage available is required only under the following conditions:

(1) the patient for the in vitro fertilization procedure is an insured, enrollee, subscriber, member, or otherwise covered employee or person under the policy, contract, plan, program, or arrangement;

(2) the fertilization or attempt at fertilization of the patient's oocytes is made only with the patient's spouse's sperm;

(3) the patient and the patient's spouse have a history of infertility of at least five continuous years' duration or the infertility is associated with one or more of the following conditions:

(A) endometriosis;

(B) exposure in utero to diethylstilbestrol (DES);

(C) blockage of or surgical removal of one or both fallopian tubes; or

(D) oligospermia;

(4) the patient has been unable to attain a successful pregnancy through any less costly applicable infertility treatments for which coverage is available under the policy, contract, plan, program, or arrangement; and

(5) the in vitro fertilization procedures are performed at a medical facility that conforms to the American College of Obstetric and Gynecology guidelines for in vitro fertilization clinics or to the American Fertility Society minimal standards for programs of in vitro fertilization.

(f) An insurer, health maintenance organization, or self-insuring employer that is owned by or that is part of an entity, group, or order that is directly affiliated with a bona fide religious denomination that includes as an integral part of its beliefs and practices that in vitro fertilization is contrary to moral principles that the religious denomination considers to be an essential part of its beliefs is exempt from

>    this section's requirement to offer  coverage
>    for in vitro fertilization.

Ins. Code art. 3.51-6, § 3A.

Several salient points should be noted in this statute. First, coverage for in vitro fertilization procedures is mandated only if the insurance policy also provides pregnancy-related benefits. Art. 3.51-6, § 3A(a).  Second, coverage in such instances need be made available only to the same _extent_ that coverage is provided for pregnancy-related procedures. _Id._ § 3A(d).  Third, benefits for in vitro fertilization procedures may be limited to persons who have specified pre-existing medical conditions. _Id._ § 3A(e). Finally, benefit providers and policyholders "directly affiliated with a bona fide religious denomination that includes as an integral part of its beliefs and practices that in vitro fertilization is contrary to the moral principles that the religious denomination considers to be an essential part of its beliefs" are exempt from the requirement to offer coverage for in vitro fertilization. _Id._ § 3A(f).

Thus, a group policyholder may avoid the requirement to provide coverage for in vitro fertilization procedures by either ending _all_ coverage for _any_ pregnancy-related condition _or_ meeting the test for a religious exemption.[2]

We caution that the federal Pregnancy Discrimination Act of 1978, 42 U.S.C. section 2000e(k), requires that employees or their insured spouses disabled due to pregancy-related medical conditions must be provided the same benefits as those furnished to other workers and their spouses for "all employment-related purposes, including receipt of benefits under fringe benefit programs . . . ." _Id._ See also Newport News Shipbuilding and Drydock Co. v. EEOC, 462 U.S. 669 (1983) and Attorney General Opinion

---

2.  We note that a policyholder who is entitled to an exemption on religious grounds from the requirement to provide coverage for in vitro fertilization procedures may continue to provide coverage for pregnancy-related conditions, while a policyholder unable to obtain such an exemption on religious grounds must terminate coverage for all pregancy-related conditions before lawfully refusing coverage for in vitro fertilization procedures. We express no opinion on the constitutionality of this provision.

JM-337 (1985).  Thus, if an employer subject to the  federal law  terminates  fringe  benefit  payments  applicable  to pregnancy-related conditions to avoid coverage for in  vitro fertilization procedures, then  the employer  also must  end all fringe benefit plans covering other medical conditions.

## I.

You first ask:

> Under article  3.51-6, section  3A of  the Insurance Code, does  the group  policyholder or the individual employee covered under  the group policy have the right to reject  cover- age for in vitro fertilization?

The Insurance Code requires  that group accident and  health insurance policies be issued to those who are denominated by the code  as the  "policyholder."   Ins. Code  art.  3.51-6, § 1(a)(1)-(6).  See, e.g.,  art. 3.51-6, § 1(a)(1)  ("policy issued to an employer . . . who shall be deemed the  policy- holder, insuring employees of such employer for the  benefit of persons other than the employer.").  Beneficiaries  under group insurance policies are issued a "certificate of insur- ance," and not a "policy." Ins. Code art. 3.51-6, § 1(a)(c).

Likewise, section 3A of the code which mandates  cover- age  for  in  vitro  fertilization  clearly  identifies  the policyholder as the  entity to which  an offer for  coverage for in vitro  fertilization must  be made.   Ins. Code  art. 3.51-6, § 3a(a), (b).  The policyholder may reject the offer of coverage and such rejection  must be in writing.  Id.  at § 3A(c).  Nowhere is  it provided that  individuals who  are merely the beneficiaries under a policy of insurance  issued to their employer have any  right to reject such element  of the group insurance coverage.

## II.

You next ask:

> If an insurer issues  a group policy to  a company  whose  headquarters  are  domiciled outside Texas  but  the group  policy covers Texas-based  employees,  is  the  insurer required  to  offer  coverage  for  in  vitro fertilization to [the] Texas employees?

and

> If the group policyholder has the right to reject coverage under section 3.51-6, § 3A of the Insurance Code, does the company whose headquarters are domiciled outside of Texas have the right to reject coverage for in vitro fertilization on behalf of its Texas employees?

Article 21.42 of the Insurance Code provides that:

> Any contract of insurance payable to any citizen or inhabitant of this State by an insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be made payable without this State, or at the home office of the company or corporation issuing the same.

Ins. Code art. 21.42.

Article 1.14-1 of the Insurance Code sets forth the transactions which constitute "doing an insurance business in this state." Ins. Code art. 1.14-1, § 2(a). Whether an insurance company is doing business in Texas is a question of fact. Id.

If an insurance company doing business in Texas issues a group insurance policy to an out-of-state employer for the benefit of its employees in Texas, article 21.42 applies, and the provisions in article 3.51-6 relating to mandatory coverage for in vitro fertilization procedures govern the policy. John Hancock Mutual Life Ins. Co. v. Schroeder, 349 F.2d 406 (5th Cir. 1965); General American Life Ins. Co. v. Rodriquez, 641 S.W.2d 264 (Tex. App. - Houston [14th Dist.] 1982, no writ); Locomotive Eng. & Cond. Mut. Prot. Ass'n v. Bush, 576 S.W.2d 887 (Tex. Civ. App. - Tyler 1979, no writ). Cf. Howell v. American Live Stock Ins. Co., 483 F.2d 1354 (5th Cir. 1973) and Austin Building Company v. National Union Fire Ins. Co., 432 S.W.2d 697 (Tex. 1968). See generally Cox, Group Insurance Contracts for Employees, 38 Tex. L. Rev., 211, 230 (1959).

But the courts have held that group insurance policies issued to an employer domiciled outside the state for the

benefit of its employees in Texas by insurers <u>not otherwise "doing business" in the state</u> are governed by the law of the place where the policy is issued, and not by the Insurance Code. <u>Boseman v. Connecticut General Life Ins. Co.</u>, 301 U.S. 196 (1937) (interpreting former article 5054, V.T.C.S., now article 21.42 of the Insurance Code); <u>Schroeder</u>, <u>supra</u>, <u>Metropolitan Life Insurance Co. v. Wann</u>, 109 S.W.2d 470 (Tex. 1937).

However, ruling case law in Texas on the choice-of-law issues implicit in your queries has changed completely since the decision in <u>Boseman</u> and the various Texas cases which rely on it, including decisions issued as recently as 1982.

In <u>Boseman</u>, the United States Supreme Court applied what now might best be considered as the "traditional" choice of law rule for determining the applicable law governing the contract performance questions -- the so-called "lex loci contractus/place of performance" rule. <u>Boseman</u>, 301 U.S. at 201. <u>See generally</u> Scoles and Hay, Conflict of Laws §§ 18.14-18.15 (1984) and <u>Multum non multa -- Festschrift fur Kurt Lipstein</u>, 251, 256 (P. Feurstein and C. Perry eds. 1980). <u>See also</u> <u>Restatement First, Conflict of Laws</u>, § 331 (1934).

In <u>1984</u>, in a seminal shift in the choice of law regime, the Texas Supreme Court announced that the "lex loci contractus" doctrine, including the "place of performance" rule would no longer be followed. Instead, the law of the state with the most significant relationship to a particular substantive issue concerning the performance of a contract obligation is to be applied, absent a valid choice of law clause in the contract dictating otherwise. <u>Duncan v. Cessna Aircraft Co.</u>, 665 S.W.2d 414 (Tex. 1984).

The rule announced for the resolution of choice-of-law in <u>Duncan</u> follows that in the current version of the Restatement of Laws published by the American Law Institute:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

> (a) the needs of the interstate and international systems,

(b)  the relevant policies of the forum;

(c)  the relevant policies of other in-terested states and the relative interests of those states in the determination of the particular issue,

(d)  the protection of justified expecta-tions,

(e)  the basic policies underlying the particular field of law,

(f)  certainty,  predictability  and uniformity of result, and

(g)  ease in determination and application of the law to be applied.

Restatement (Second) of Conflict of Law, § 6 (1971). See 665 S.W.2d at 426.

In light of the adoption of the restatement test by the Texas Supreme Court in Duncan, we think that even in the case of an insurance company not doing business in Texas which issues policies to out-of-state employees for coverage of their Texas employees, a court would probably apply the substantive provisions of Texas insurance law to the con-tract, thus subjecting such contract requirements relating to coverage for in vitro fertilization procedures set out in article 3.51-6, section 3A of the Insurance Code.

## S U M M A R Y

An employer furnishing a group health insurance policy for the benefit of its employees in Texas is the "policyholder" within the meaning of a provision of the Insurance Code which grants to "policy-holders" the right to reject insurance coverage for in vitro fertilization pro-cedures. Ins. Code art. 3.51-6, § 3A. The Insurance Code does not extend to employee beneficiaries of group health insurance plans the right to reject coverage for in vitro fertilization procedures. Under current choice of law rules, a court would probably hold that article 3.51-6, section 3A, of the Insurance Code applies to contracts for group

> health insurance entered into by employers located outside of the state for the benefit of employees within the state, whether or not the insurance company is otherwise "doing business" in Texas.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Don Bustion and
Susan L. Garrison
Assistant Attorneys General