[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10242

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JARVIS HOSKINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cr-00113-MLB-JSA-3

_____

Before JILL PRYOR, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Jarvis Hoskins appeals his 48-month sentence for conspiracy to commit bank larceny and to possess stolen bank funds. On appeal, Hoskins argues that his sentence is substantively unreasonable. After careful review, we affirm.

## I.　FACTS AND PROCEDURAL HISTORY

In 2022, Hoskins, Rodney Brooks, and Michael Hollins were charged with conspiracy to commit bank larceny and possess stolen bank funds, 18 U.S.C. § 371 ("Count One"), bank larceny, 18 U.S.C. §§ 2113(b) & 2 ("Count Two"), and possession of stolen bank funds, 18 U.S.C. §§ 2113(c) & 2 ("Count Three"). In a plea agreement, Hoskins later agreed to plead guilty to Count One, and the government agreed to dismiss Counts Two and Three and recommend that Hoskins receive a sentence at the low end of the applicable guidelines range.

Before sentencing, a probation officer prepared a presentence investigation report ("PSI") detailing the following offense conduct. In March 2021, Hoskins, Hollins, and Brooks burglarized a Brink's van in Sandy Springs, Georgia while the van's driver was out of sight refilling an ATM at a bank. Surveillance video showed a GMC Terrain with a temporary paper license plate pull into the bank's parking lot shortly after the Brink's van arrived. The GMC backed up next to the Brink's van. A passenger exited the GMC and used a device to shatter the front passenger window of the

Brink's van. The man grabbed two bags containing $134,000 in cash, returned to the GMC, and drove away.

Footage from traffic cameras and license plate readers showed that a second vehicle, a Nissan Pathfinder, acted as a lookout during the burglary. Rental car records showed that Brooks rented the Pathfinder and that Hollins rented the GMC Terrain. Cell phone records for Hollins, Brooks, and Hoskins showed that their phones had been in the vicinity of the bank during the time of the burglary and that the men had been in contact with one another. Google provided account content for Brooks' email account which contained photographs from around the time of the incident, including street signs in the area, the rental vehicles, large amounts of cash and Brink's packaging consistent with the sums stolen, and images and receipts of luxury goods purchased after the theft.

The PSI also calculated an advisory guideline range for Hoskins. First, for a conviction under 18 U.S.C. § 371, it calculated a base offense level of six, U.S.S.G. §§ 2X1.1(a) & 2B1.1(a)(2). It then added eight levels because the offense caused a loss of $134,000, U.S.S.G. § 2B1.1(b)(1)(E), and applied a two-level reduction because Hoskins had accepted responsibility, U.S.S.G. § 3E1.1(a), yielding a total offense level of twelve.

The PSI listed Hoskins' lengthy criminal history which led to a total criminal history score of twenty-three and a criminal history category of VI. It reported six juvenile adjudications in 2000 and 2001—two for theft, two for robbery, one for aggravated

assault with a deadly weapon, and one for marijuana possession—as well as twenty adult criminal convictions, including nine related to theft, burglary, or identity fraud. Relevantly, in March 2007, Hoskins pleaded guilty to giving false identifying information to law enforcement while detained, and marijuana possession. In May 2007, he pleaded guilty to unlawful carrying of a handgun. In both August 2007 and February 2008, he pleaded guilty to driving with a suspended license. In August 2008, he pleaded guilty to theft and burglary, and he was sentenced to one- and three-years' custody for those crimes, respectively. In May 2010, he pleaded guilty to theft and evading arrest with a vehicle for which he was sentenced to eight months' imprisonment. In January 2011, he pleaded guilty to marijuana possession. In September 2011, he pleaded guilty to two counts of theft and one count of possession of a firearm by a felon and was sentenced to three years' custody. Less than a month after his release, Hoskins was arrested for theft of a motor vehicle, pleaded guilty to that charge, and was sentenced to 180 days' custody. In March 2015, he pleaded guilty to driving with a suspended license and possession of a window punch for burglarizing motor vehicles. In May 2018, he pleaded guilty to delivering cocaine and was sentenced to two years' custody. In October 2018, he pleaded guilty to fraud, use/possession of identification information, and was sentenced to two years' custody. The same month, he pleaded *nolo contendere* to burglary of a vehicle and was sentenced to five months and twenty-four days of confinement. In 2022, he pleaded guilty to fraudulent possession of identification items and was sentenced to fifteen years' custody.

Based on a total offense level of twelve and a criminal history category of VI, the PSI calculated Hoskins' guidelines imprisonment range to be thirty to thirty-seven months' imprisonment. It also noted that the maximum term of imprisonment was five years. Further, it reported that, in the prior five years, the average and median sentence for defendants sentenced under § 2B1.1 with an offense level of twelve and criminal history category of VI was thirty months' imprisonment. Neither party objected to the PSI's guidelines calculations.

The PSI also detailed Hoskins' personal and family information. Hoskins' father was murdered in 2019. Hoskins described his childhood as being negative, explaining that his father was imprisoned while he was a child, and he regularly visited his father in prison. Hoskins himself was in and out of juvenile custody from age twelve to nineteen. Still, Hoskins had a daughter and two stepsons, all of whom he lived with before his arrest.

Prior to sentencing, Hoskins submitted a sentencing memorandum in which he discussed his background and explained that his criminal history began at twelve years old and that his "formative years" between six and thirteen consisted of visiting his father at prison. He explained that, by the time his father was released, he was already "involved in his own criminal activity" that had continued into adulthood. He also highlighted mitigating facts, including that he was "a positive presence in the life of his children and his family" and that he had made efforts "towards a productive lifestyle" while incarcerated, evidenced by the educational certificates

he earned and the self-help books he had read.  He expressed a de-sire to obtain a commercial driver's license and begin a trucking business.  He sought a thirty-month sentence and reiterated that he would work while incarcerated to prepare for a "productive life-style" upon his release.  He also contended that a sentence of more than thirty months would create a sentencing disparity between him and similarly-situated defendants.  Hoskins attached several letters from friends and family to his sentencing memorandum.  One writer shared that Hoskins "ha[d] been a positive presence [in his children's] lives."  His wife noted that he was hardworking and was committed to improving himself while in prison.  Hoskins' daughter and two stepsons commended him as a father, and one stepson wrote that Hoskins had taught him more than his own bi-ological father.  His daughter wrote that Hoskins "ha[d] always been there for [her], [her] brothers and [her] mom . . . providing guidance and support whenever needed."

Hoskins also mailed a letter with a personal statement to the court.  Hoskins agreed that the PSI showed his "trouble[d] past" but he argued that it did not "show how far [he had] come to trans-form [his] life."  He described various financial challenges when he was younger that had led him into a life of crime.  After having previously served time in prison, he explained, he had started a "24/7 lockout and towing service."  However, "[t]imes had got hard" again and he chose "to do the wrong thing instead," leading to another arrest, conviction, and imprisonment.  After his release, Hoskins lost multiple jobs after failing background checks, which "led [him] back to committing crime to provide for [his] family."

24-10242                Opinion of the Court                7

Hoskins reported taking classes to further his education as he worked towards earning a G.E.D. during his incarceration. He expressed that he did not have "any excuse for the crime [he had] committed," but explained that he had been "thinking about how I could provide for my family." He also accepted responsibility, stating his determination "to work in every way possible to reconcile with society," and asked for mercy as a "humiliated man." He enclosed transcripts and certificates from the coursework he had completed in prison.

The government submitted a sentencing memorandum which noted that Hoskins, Hollins, and Brooks had traveled from Texas to Georgia to commit this crime and had used the stolen money to purchase luxury goods and to party. It identified three aggravating factors: (i) Hoskins' consistent contact with law enforcement starting in 1999; (ii) his serious felony convictions including robbery, burglary, and firearms offenses; and (iii) his current incarceration for another theft crime—fraudulent possession of items of identifying information. It contended that this was not a "crime of necessity"—rather, Hoskins and his codefendants "frivolously used the stolen money to buy luxury goods and feed their vices"—so "the circumstances d[id] not beget leniency." That said, it conceded that Hoskins had "accepted responsibility . . . without delay," pleaded guilty promptly, and had not acted violently—so it recommended a sentence at the lower end of the guidelines range.

At sentencing, the district court stated it had reviewed the PSI, the parties' memoranda, the letters from Hoskins' family and

friends, and the documents Hoskins had personally mailed to the court. Both parties agreed there were no other documents to consider and that there were no objections to the PSI. The court adopted the PSI in whole and reiterated that Hoskins had an offense level of twelve, a criminal history category of VI, and a guidelines range of thirty to thirty-seven months.

The district court stated that it had considered the factors in 18 U.S.C. § 3553(a) and would provide its preliminary view of them. It expressed that Hoskins' crime had been done "for no apparent reason" other than to "spend the money on shopping sprees and at clubs." The court also noted Hoskins' "significant" criminal history, which had not occurred in a "big spree" but had been "accumulated over a lifetime through earnest efforts to continue violating the law." While it recognized that Hoskins had family who spoke on his behalf, it stated that it "suspect[ed] that" Hoskins' criminal conduct had "wreak[ed] havoc on [his] family." The court also noted the need to deter and appropriately punish those who commit crimes not because of "drug addiction or . . . dire need" but, instead, do so on a "casual and needless basis." It stated that there was no need "to drive from Texas to Atlanta to commit a robbery," and expressed uncertainty that a thirty-month sentence would afford adequate deterrence or protect the public. It added that it had considered "[t]he kinds of sentences available and the sentencing range" and the need to avoid "unwarranted disparities," including the PSI's explanation that defendants "within this range with this category of criminal history, some good number of them are sentenced at 30 months . . . ." However, it reiterated that the

"casual and needless basis for this crime" was troubling. It also noted that Hoskins was not just in criminal history category VI, he was "well, well, well above" that level because he had reached the maximum criminal history category when he exceeded thirteen criminal history points. It added that it could not "find [any] explanation for [Hoskins'] criminal history" that did not "reflect [a] dire need to protect the public from more crimes." It explained that Hoskins had repeatedly committed theft and burglary offenses and his sentences did not deter him from committing more similar offenses. In the court's view, Hoskins had "a fervent dedication to criminal activity" and a thirty-month sentence did not seem to be a "magic bullet that [would] adequately protect[] the public from his further crimes . . . ." After providing these initial thoughts, the court asked the parties for their arguments on an appropriate sentence.

The government noted that the crime appeared to be "premeditated" because the defendants rented cars, took two cars even though they could have fit in one, and "switched out the plate on at least one car." It also agreed with the district court that the crime was not "to feed [Hoskins'] family or because of need." Moreover, this was a case with "strong circumstantial evidence" which revealed the money was spent "frivolously . . . on luxury goods as well as at the clubs." It noted that Hoskins had accepted responsibility quickly and, because his offense level was so low, received only two points for accepting responsibility instead of three. Finally, it contended that Hoskins was "probably equally as culpable" as Hollins, whom the court had sentenced to twenty-seven

months.  The court noted that Hollins and Hoskins had significantly different criminal histories.  The government agreed but argued that Hollins also had a very serious criminal history, even if not as extensive as Hoskins'.  Recognizing some differences, it ultimately reiterated that Hoskins and Hollins were "equally culpable in the offense" and "their guidelines came out substantially similar."

The court responded that it was "struggling to get below five years" because "the minute" Hoskins was released, it believed "he [wa]s going to do something else."  The government then suggested that Hoskins' sentence could be imposed to run consecutively to his state sentence in Texas as Hoskins had not gotten any credit for his time in federal custody.  It also volunteered, in mitigation, that Hoskins had told his codefendants that he wanted some, if not all, of his money to go to his family, and the court agreed that this fact was mitigating.  The court then addressed the letters that Hoskins' family submitted, noting that what they had said about him was "clearly love."  However, it expressed that Hoskins was "such a selfish person" that his family's emotions about him defied logic, given his acts.  The government concluded by highlighting Hoskins' acceptance of responsibility.

Hoskins, in turn, argued that his offense was a mere financial crime without violence.  The court explained that Hoskins, who acted from "pure greed," was different from people who have a drug addiction, grew up selling drugs, or are brought to the United States to sell drugs.  Hoskins admitted he stole solely to obtain

money but argued that the absence of a dire need should not be an aggravating factor. Even so, the court expressed that "the cavalierness of the crime was indicative of" Hoskins' character, and expressed concern that society needed protection from his future behavior given his lengthy criminal history. Hoskins argued that his criminal history points accounted for these concerns, but the court disagreed and emphasized that criminal history points stop affecting a guidelines range after a defendant accumulates thirteen points.

Hoskins next argued that the court should consider the letters that were submitted on his behalf and the fact that he filed no frivolous motions, accepted responsibility, and took a plea in what he characterized as a "triable case" because no witnesses saw him. He also reiterated that he would not get credit for his year in federal custody because he was serving a state sentence and argued that the court should give more weight to the educational work he had done while in federal custody "to turn himself around" and to the letters submitted on his behalf. The court stated that it was trying to properly weigh those facts but found it difficult to believe Hoskins' assurances. It also noted that Hoskins and Hollins were distinguishable—Hollins had only one lengthy sentence from around 2000 and minor sentences since that time, while Hoskins had received multiple sentences—shorter than Hollins' sentence—over a significant timeframe. Thus, it explained that it thought a longer sentence was needed to deter Hoskins. Hoskins reiterated that the guidelines range had been "appropriately calculated" and represented adequate punishment accounting for his past

convictions.  He also emphasized his difficult start to life, especially visiting his father in prison from the age of six, and the normalization of a lifestyle of crime and incarceration.

The court explained that hopes and plans for self-improvement must be "proven through action, not words."  It added that it could not ignore the danger Hoskins posed to the public because of his repeated crimes.  Hoskins objected, arguing that the court's comments gave no weight to the work he had done since his federal incarceration.  The court admitted as much "in case [he] want[ed] to appeal," because "very little weight" was due to his rehabilitation efforts given they were "in the avenue of aspirational." Instead, it gave "much more weight" to Hoskins' actions as an adult.  It noted that it had considered Hoskins' letter and the letters submitted on his behalf, but reiterated that they deserved "very little weight" compared to what he had done when he was out of prison.

Hoskins then argued again that the court was overly punishing him for his criminal history, which was already reflected in his guidelines range, and he highlighted mitigating factors and the low-end sentencing recommendation that both he and the government had proposed.  Hoskins' wife and his mother also spoke on his behalf, highlighting his positive qualities and seeking leniency. Hoskins likewise spoke on his behalf, apologizing to the court and the victims of his offense.  He admitted losing his way and discussing his difficult upbringing.  He also explained his struggle to keep

a decent job due to his status as a felon and shared his recent efforts towards enhancing his education.

The court returned to its comparison between Hoskins and Hollins. It remarked that Hollins had "one big conviction" around 2000 and a few shorter sentences since then and less criminal history overall than Hoskins. In contrast, Hoskins was in "a different situation" with "well in excess of" criminal history category VI with "23 points on a scale that stops at 13" and "two prior incarcerations for 30 months" that did not deter him from committing this crime. It emphasized that Hoskins' repeated crimes suggested that the court was "doing the same thing and expecting a different outcome." However, it accepted the Hoskins' "good intentions" and explained that it had expected to impose a 60-month sentence, the statutory maximum, but had reconsidered. It also credited Hoskins' arguments about the nature of the offense and reiterated that it had considered the § 3553(a) factors, the guidelines, and sentencing disparities based on both the PSI's statistics and Hollins.

In light of these factors, the district court sentenced Hoskins to forty-eight months' imprisonment, to be followed by three years of supervised release. The court explained that it did not believe that the guidelines range captured Hoskins' criminal history or the danger he posed. It also reasoned that a sentence greater than what Hoskins had received for his past crimes was necessary to change his behavior. Hoskins objected to the sentence based on the court's upward variance. Hoskins' appeal followed.

## II. STANDARD OF REVIEW

"We review the substantive reasonableness of a sentence for an abuse of discretion." *United States v. Butler*, 39 F.4th 1349, 1354-55 (11th Cir. 2022). "In reviewing the reasonableness of a sentence, we will not substitute our own judgment for that of the sentencing court and we will affirm a sentence so long as the court's decision was 'in the ballpark of permissible outcomes.'" *Id.* at 1355 (quoting *United States v. Rosales-Bruno*, 789 F.3d 1249, 1257 (11th Cir. 2015)). A party challenging a sentence as unreasonable bears "the burden of establishing the sentence is unreasonable in light of the record and the § 3553(a) factors." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

## III. DISCUSSION

On appeal, Hoskins contends his sentence is substantively unreasonable for several reasons. He first contends that he and Hollins were "similarly situated in terms of criminal history and in terms of the roles they played." He notes the government had agreed that the two men were equally culpable. He states that he received a "substantially higher sentence than similarly situated defendants nationwide" receive. He contends the district court unnecessarily relied on his criminal history, which was a factor already taken into account by the Sentencing Guidelines. He also notes that the court did not have similar concerns about Hollins' criminal history which shows that the disparity in the two sentences was "unwarranted."

He also contends that the district court failed to meaningfully consider the mitigating factors he identified. He reiterates that there was no violence involved, his conduct led to a low offense level, and his criminal history was already factored into his guidelines range. He also points to the letters from his family and friends which highlighted positive aspects of his character. In sum, he contends the court gave too little weight to that evidence and failed to provide a sufficient basis for doing so.

The government contends the district court did not err. It asserts that the district court addressed each of Hoskins' arguments and that the record supports the court's conclusion that Hoskins and Hollins were not similarly situated. Finally, it asserts that Hoskins' reliance on data about offenders with similar guidelines calculations does not show error because the data does not establish that Hoskins was similarly situated with those other defendants. It concludes by arguing that the court provided a "fulsome sentencing proceeding with justification" for its upward variance.

Under § 3553(a), a district court must impose a sentence "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, and to protect the public from future crimes of the defendant. 18 U.S.C. § 3553(a). In addition, the court must consider, among other factors, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly-situated defendants. *Id.*

"[W]e have identified three ways in which a district court can abuse its discretion [and] impos[e] a substantively unreasonable sentence: (1) failing to properly consider a relevant sentencing factor that was due significant weight, (2) giving significant weight to a factor that was not relevant, or (3) committing a clear error of judgment by weighing the sentencing factors unreasonably." *Butler*, 39 F.4th at 1356; *see also United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*) (same).

A sentencing court must consider all relevant § 3553(a) factors, but "the weight given to each factor is committed to the sound discretion of the district court," and it may attach great weight to one factor over the others. *Butler*, 39 F.4th at 1355. In general, "a district court's acknowledgment that it has considered the § 3553(a) factors and the parties' arguments is sufficient." *Id.* (citing *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009)). "Upward variances are imposed based on the § 3553(a) factors," so a court may permissibly "impose an upward variance if it concludes that the Guidelines range was insufficient in light of a defendant's criminal history." *Id.* at 1355. Similarly, "in imposing a variance," a court "may consider conduct that [was already] considered in calculating the defendant's advisory guidelines range." *United States v. Moran*, 778 F.3d 942, 983 (11th Cir. 2015).

Although a sentencing court is required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," a sentencing disparity among co-defendants is usually not grounds for appellate

relief. *United States v. Cavallo*, 790 F.3d 1202, 1237 (11th Cir. 2015); 18 U.S.C. § 3553(a)(6). In addition, "[a] well-founded claim of [unwarranted] disparity . . . assumes that apples are being compared to apples." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quoting *United States v. Mateo-Espejo*, 426 F.3d 508, 514 (1st Cir. 2005)). Evaluating alleged sentencing disparities among similarly-situated defendants requires "more than the crime of conviction and the total length of the sentences." *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015). "The underlying facts of the crime and *all of the individual characteristics* are relevant." *Id.* (emphasis added).

Here, Hoskins has not shown that the district court imposed a substantively unreasonable sentence. *Gonzalez*, 550 F.3d at 1324. The court stated that it heard the parties' arguments and had considered all the § 3553(a) factors, and it also provided factual support in its discussion of the factors. *Butler*, 39 F.4th at 1355; *Sarras*, 575 F.3d at 1219. The court also addressed Hoskins' claim that it was improperly focusing on his criminal history which had already been factored into his guidelines range by explaining that ten of Hoskins' twenty-three criminal history points had no effect on his guidelines range calculation because everything above thirteen points falls into criminal history category VI. *See* U.S.S.G. § 5, pt. A. In addition, the court did not err in varying upward based on conduct that was already used to calculate Hoskins' guidelines range— our precedent permits exactly that. *See Moran*, 778 F.3d at 983–84; *Butler*, 39 F.4th at 1355.

The district court also considered Hoskins' mitigating evidence and permissibly gave that evidence lesser weight than his criminal history and the need to protect the public. *Butler*, 39 F.4th at 1355; *Sarras*, 575 F.3d at 1219. The court provided a detailed explanation for its conclusion that this mitigating evidence was "aspirational" and was not as representative as Hoskins' conduct while out of prison—*i.e.*, his repeated arrests and convictions for largely similar conduct. The district court had considerable discretion in weighing these relevant factors, *Butler*, 39 F.4th at 1355, and it did not "(1) fail[] to properly consider a relevant sentencing factor that was due significant weight, (2) giv[e] significant weight to a factor that was not relevant, or (3) commit[] a clear error of judgment by weighing the sentencing factors unreasonably," *id.* at 1356.

Finally, the district court did not create an unwarranted sentencing disparity between similarly-situated defendants. As our precedent requires, the district court considered the underlying facts of the crime and each of the defendants' individual characteristics. *Azmat*, 805 F.3d at 1048; *Cavallo*, 790 F.3d at 1237. The court discussed Hoskins' more extensive, recent, and repeated criminal history related to theft and fraud and noted that Hollins had only received one substantial sentence roughly 20 years earlier. It also correctly noted that the two codefendants had different criminal history levels under the guidelines which meant they were not similarly situated. Given the district court's careful consideration of all relevant factors relating to Hoskins and Hollins—which included much "more than the crime of conviction and the total length of the sentences"—it did not abuse its discretion. *Azmat*, 805 F.3d at

1048. Where, as here, the district court correctly concludes that "apples are [not] being compared to apples" the disparity is not unwarranted. *Docampo*, 573 F.3d at 1101.

## IV. CONCLUSION

When we review a sentence for substantive reasonableness, we ask only whether the sentence the defendant received was "in the ballpark of permissible outcomes." *Butler*, 39 F.4th at 1355. On these facts, Hoskins has not borne his burden to show that the district court abused its discretion and imposed an unreasonable sentence. *Gonzalez*, 550 F.3d at 1324. We, therefore, affirm.

**AFFIRMED.**